## David Kemp *v.* The State.

1. Grand Jury — Challenge to the Array or to Any Member of a grand jury is authorized by the Code of Procedure, but it defines the only causes for challenge and explicitly requires the challenge to be made before the grand jury is impaneled,— securing to a prisoner in the county jail the right, upon his request, to be brought into court to make the challenge. *Held,* that by these provisions the right to impeach the qualifications or the legality of a grand jury is limited to the time prescribed and confined to the causes specified; and a prisoner who has omitted to request that he be brought into court to make the challenge cannot impeach the grand jury by pleading in abatement of the indictment preferred against him.

2. Same — Case Stated.— To an indictment for murder the defendant pleaded in abatement that he was in jail when the grand jury was organized; that he was a friendless minor without means to employ counsel, and had no counsel until after the indictment was presented; that he was not apprised of his right to challenge the array or any member of the grand jury; that the persons composing it

Statement of the case.

were not selected for the term by the jury commissioners, nor was the list of them certified by the commissioners as required by law; that the envelope containing the list was not properly indorsed, and was opened by the clerk before he was authorized by law to open it; that the grand jurors were summoned by an unauthorized person, and that one of them was a principal witness against the defendant. *Held*, that the plea was properly overruled. See the opinion for a collocation of the articles of the Code of Procedure which control the subject.

3. SAME — PRACTICE.— Unless requested by a prisoner confined in the county jail, the opportunity to challenge the grand jury is not a matter of right; but with a view to the prevention of improper prosecutions, the practice of affording such prisoners an opportunity to challenge the grand jury is one to be commended.

4. CHANGE OF VENUE — PRACTICE.— The trial judge commenced his charge to the jury by informing them that the homicide was committed in another county, and that " the case is in this court by change of venue." Objection to this is based on the fact that the transcript of the proceedings of the court *a quo* had not been filed in the trial court. *Held*, that the judge was fully warranted in apprising the jury of the *status* of the case, and the omission to file the transcript was a mere irregularity which was amenable to subsequent correction.

5. CULPABLE HOMICIDE — DFFENSE OF SELF OR OF ANOTHER.— The cases of *Guffee* v. *State*, 8 Texas Ct. App. 187, and *Foster* v. *State*, Id. 248, cited and approved with respect to the distinctions between the degrees of culpable homicide, and upon the amenability of one who, having interfered in a combat between his friend and the deceased, becomes involved in it and kills the latter.

6. MURDER IN THE FIRST DEGREE — EVIDENCE.— Note the proof which, on this appeal from a capital conviction, is held insufficient to show that the killing was upon express malice.

APPEAL from the District Court of Coryell. Tried below before the Hon. T. L. NUGENT.

In May, 1881, the grand jury of Hamilton county presented an indictment which charged David Kemp, the appellant, with the murder of F. A. Smith, on the 2d of said month, by shooting him with a pistol. By change of the venue, the cause was transferred to the District Court of the adjoining county of Coryell, and in the ensuing month of June a trial was there had, and the ap-

pellant was convicted of murder in the first degree, and his punishment assessed at death.

Upon the fact that F. A. Smith, the deceased, was shot and instantly killed in the town of Hamilton, by the appellant, on the 2d of May, 1881, there was no controversy. The appellant and Dan Bogan, his friend, had been in town for several hours, and the latter, it appears, had been drinking during the day. The affray in which Smith was killed took place close by Cropper's store, which was situated on the north side of the public square, near the northeast corner, and fronted south. Along the east side of the store-house was a highway, running north and south. Until the circumstances which precipitated the conflict, it seems that the antagonists were entire strangers to each other.

F. L. Cropper, the proprietor of the store, was the first witness introduced by the State. He was standing in the front door of his store and witnessed some of the shots which were fired, but not the one which killed the deceased. The witness had known the appellant and Bogan, but did not learn who the deceased was until after his death. As witness stood in his door Bogan walked up to him, using pretty rough language. While Bogan was there the appellant rode up, riding one and leading another horse, and said to Bogan once or twice, "let's go home." Bogan then went into Perry's drug-store, which adjoined witness's place on the west, and from the drug-store walked to the side of the horse which the appellant was leading. Bogan stood there and seemed to be fixing the saddle or something. A post stood about twelve feet from the southeast corner of the pavement and in front of the southeast corner of the store-house. For several hours before the affray, the wagon of the deceased had been standing in the highway on the east side of the store, and just before the affray he drove it along the side and towards the front of the

store until the heads of his horses got between the post and the pavement, and close to Bogan and the appellant, who were thus brought immediately in front of the deceased's team, the appellant being on his horse and Bogan standing on the ground. The deceased spoke very mildly to them or to some one, and requested the removal of their horses; witness could not remember the exact language of the deceased. Appellant made no reply to the deceased, but Bogan commenced swearing at him. Deceased then said to Bogan, "If it wasn't for the name of whipping a dog, I would get out and whip you;" and Bogan continuing to curse, this remark was repeated by the deceased. Bogan then passed around the post and to the east side of the deceased's wagon, took a chair out of it, flourished the chair as if to strike with it, and called the deceased a "G—d d—d son of a bitch" once or twice, and then put the chair back in the wagon. Just as Bogan replaced the chair the deceased got out of the wagon, walked up to Bogan, and, after standing there a while, said to him, "You will curse a man, but, when he gets out to fight you, you won't fight." Bogan ran his hand in his bosom, and the deceased said to him, "Draw your G—d d—d pistol and I'll knock you down." Bogan drew his pistol, and the deceased struck him. Just after Bogan stepped to the side of the deceased's wagon, the appellant got off his horse and tied its bridle reins and those of the led horse together, and then went around the post to a point close to the east hind wheel of the deceased's wagon. As the deceased got out of the wagon, Bogan backed off a piece and the deceased advanced to where Bogan was. Bogan faced north and the deceased south, and they were close together. About the time the deceased struck Bogan, the appellant had moved around to a position about seven or eight feet to the east of Bogan and the deceased. The blow staggered Bogan back seven or eight feet, his hat fell over his eyes, and the deceased followed

him up and struck him again.  At the second blow Bogan fell, with his pistol in his right hand.  Deceased kicked and struck the pistol, or reached with his left hand and knocked it, out of Bogan's hand, and several feet away to deceased's left, and then with his left hand caught Bogan by the shoulder, and was in the act of striking him with his fist, when the appellant ran up from behind and with his pistol struck the deceased on the head, the blow glancing to his shoulder.  The force of the blow discharged the pistol, and the deceased then seized Bogan's pistol and turned, and after he turned the appellant shot at him.  The shot, however, on account of some defect in the load or cartridge, was what witness called a squib. The deceased advanced and with the pistol struck the appellant's arm and knocked it down.  The appellant raised his arm and in doing so fired his pistol, and then the deceased again struck down the arm of the appellant, who again fired a squib.  All this time the appellant, holding his pistol in front of him, was backing and trying to shoot as he backed, and the deceased was following him up and striking with Bogan's pistol at the appellant's arm.  The appellant fired several times; the deceased did not attempt to shoot at all.

On his cross-examination Mr. Cropper testified that while Bogan was talking to him at the door of the store, the appellant said to Bogan, two or three times, "Come, let us go home."  Bogan was drunk.

On the re-examination the witness stated that he did not hear appellant say anything to Bogan after the latter commenced the quarrel with the deceased, which began probably five minutes after appellant asked Bogan to come and go home.  Bogan was not very drunk; he was under the influence of whisky but could walk straight. After the fourth shot the witness got behind his door, and immediately after the fifth was fired he looked out and saw the deceased falling.  Within a few minutes the deceased died.

Thomas Emmett, for the State, testified that he occupied a shop on the east side of the public square in Hamilton, and about thirty or thirty-five yards from Cropper's store.   Just before the affray he noticed Lochlin and the deceased as they passed in the direction of Cropper's store, and heard the deceased say "I will go get my wagon, and drive down and put our things in it."   A few minutes afterwards the witness saw the appellant ride by towards Cropper's store, leading a horse.   He rode up in front of Cropper's store, and Bogan was standing there on the pavement, cursing.   Mr. Gentry and Mr. Law passed into the store, and as they did so Bogan said, "I can whip any G—d d—d man in town; can't I, Law?"   The deceased then came driving down the east side of the store, and as his horses got between the pavement and the post he spoke to some one in an ordinary tone of voice, but witness could not distinguish the words.   Immediately the witness heard Bogan say "Go to hell," and at once started to the parties.   When Bogan said "go to hell," the deceased replied, "You can go there yourself."   Bogan replied, "If you get out of that wagon I'll whip you;" and the deceased said, "Yes, anybody can whip me in town, but if you were out in the country I would whip you like a dog."   They then had a general cursing match.   Bogan went around the post to the east side of the wagon, and after a little took a chair out of the wagon, struck it on the ground and put it back in the wagon, and called the deceased a d—d son of a bitch.   The deceased threw off his coat and hat, and got out of the wagon.   Bogan backed a step or two, and the deceased, advancing, said "You d—d ———, you won't fight nothing."   Bogan commenced drawing his pistol from under his coat, and witness said "Don't Dan," and motioned to him not to draw his pistol.   He smiled and put his pistol back.   The deceased said, "if you draw that pistol, I'll knock you down."   Bogan drew his pistol out, and the deceased

struck him on the chin, knocked him back, and his hat
fell over his eyes.   The deceased again struck Bogan, and
the latter fell.   In the meantime the appellant had dis-
mounted, and when Bogan fell drew his pistol and ran up
and struck the deceased over the head with it.   Deceased
rose, with Bogan's pistol, and as he did so the appellant
fired at him, the discharge being a squib.   Appellant
backed about twenty steps, step by step, trying all the
time to shoot the deceased, who followed him up and
knocked appellant's pistol off, but did not try to shoot.
Bogan picked up a large stone, came up behind the de-
ceased, and struck him two blows with it on the back of
the head and neck.   The second blow seemed to paralyze
the deceased; he stopped, stooped forward, and put his
left hand to his head.   His right hand was holding
Bogan's pistol by the cylinder.   At this time the appel-
lant fired, and immediately leaned forward and fired
again.   The deceased seemed to recover himself, and
threw the pistol at appellant with great force.   Witness
ran by the deceased to get the pistol and did not see him
fall.   The pistol struck the appellant on the neck, glanced
off, and went as far as across the court-house.

The cross-examination elicited but little more than a
repetition of the direct testimony.   The witness stated,
however, that when the deceased began to get out of his
wagon Shumaker rode up between the wagon and the
store, took deceased by the arm, and seemed to be trying
to persuade him not to get out.   Neither Bogan nor the
deceased called the other by name during the affray, and
witness was confident they did not know each other.
When the deceased got out of the wagon he said to
Bogan, "D—n you, if you want to fight now is your
time."

Thomas Bevins, for the State, testified that he was on
the pavement in front of Cropper's store, when his atten-
tion was drawn to some words passing between Bogan

and Cropper. The appellant, who was on horseback and holding another horse, asked Bogan two or three times to come and get on his horse, and go. Bogan went around to his horse as if to get on him. As the deceased drove down and got near the corner he asked some one of the three men who were there with horses, to please move up. The three men were Shumaker, Bogan and the appellant. Bogan asked the deceased who he was, and commenced walking around towards him, and cursing him at the same time. He gave the deceased the d—d lie, and the deceased returned it. Bogan said he could whip any man in Hamilton county, and deceased said " it's a lie." Bogan took a chair out of the deceased's wagon, struck it on the ground, and put it back; and then called the deceased a stinking son of a bitch. Deceased said he wouldn't take that, got up, pulled off his coat and hat, and got out of the wagon. The remaining incidents were related by this witness in substantial accordance with the testimony of the witnesses who had preceded him. He stated, however, that the appellant, when he fired the fatal shot, put his pistol so close to the breast of the deceased that the discharge powder-burned the latter's clothes. The ball passed through his breast and came out at his back. When the deceased threw his pistol at the appellant it struck the latter on the neck and fell just beyond him. Deceased did not throw it but a little ways. Appellant ran off and was pursued by Mr. Gentry, and twice snapped his pistol at Gentry.

The prosecution examined two other witnesses in chief to the incidents of the affray, but their testimony was not so full and circumstantial as that already detailed. One of them stated that the deceased was a tolerably stout, active man, and weighed about 175 or 180 pounds, and that Bogan weighed about 155.

B. T. Howard was the first witness introduced by the defense. He witnessed the affray in which the deceased

was killed.    While standing on the pavement and near
the southeast corner of Cropper's store, his attention was
attracted by Bogan saying he could whip any man in town
who had anything against him.    He said this two or
three times.    The deceased drove down to near the corner
of the store, so that his horses' heads got between the
post and the pavement.    Bogan stepped off the pavement
and went around the wagon and team, still saying that
he could whip any man in town who had anything
against him.    He had the appearance of a man who had
been drinking.    Up to this time his remarks were general.
The deceased said to Bogan, "I could whip you if I felt
like it, and that d—d quick;" and then Bogan turned
towards the deceased and for the first time addressed his
remarks to him.    He jerked a chair out of the wagon as
if he was going to strike, and then put it back.    Deceased
jumped out of the wagon, and he and Bogan cursed each
other and finally came to blows.    When the deceased got
out of the wagon he advanced on Bogan, who retreated
as if to get out of the way.    Finally the deceased struck,
and the whole thing was so obnoxious to the witness that
he got out of the way.    Before the deceased got out of
the wagon a man rode up and tried to keep him from
getting out; and some one tried to get Bogan off.    During
the quarrel before the deceased got out of his wagon,
Bogan was daring him to get out, and he was telling
Bogan what he could do if he should get down.    After
moving away the witness heard two shots, very close
together, and, looking back, saw the rush of the smoke
from opposite directions.    After those two shots but one
more was fired.    At the time of the affray the witness
was not acquainted with either the deceased or the
appellant.

On his cross-examination the witness stated that he did
not see the pistols, nor recognize the parties who did the
shooting.    There was first one shot, then two in rapid

succession, and it was when these two were fired that witness glanced round and saw the rush of smoke. It was near where Bogan had been knocked down, and some of it came from near where the deceased was, and some from another direction.

J. B. Wallace, for the defense, testified that he was in the town of Hamilton when the deceased was killed. There was a man standing in the street who was drunk, and trying pretty hard to get up a fuss; and he succeeded in getting one before he quit. The deceased drove up in his wagon and stared at the man for nearly half a minute, and Bogan looked at the deceased. Bogan said "I can whip you,—whip a dog," and continued abusing and cursing the deceased very roughly until the latter got out of the wagon. Bogan got a chair out of the wagon, struck it on the ground, and put it back in the wagon. He called the deceased a d—d son of a bitch, a stinking son of a bitch, and so forth, and backed back. The deceased, when he got out of the wagon, advanced on Bogan and said "You are a d—d rascal; will fight nothing,"—holding his left hand up and shaking it in Bogan's face. Bogan put his hand to his side, and the deceased said "if you pull that pistol I will knock you down," and immediately struck Bogan and knocked him down. It was a powerful blow. The deceased then wrenched Bogan's pistol out of his hand, straightened himself up and stepped back. This witness's testimony stops at this stage of the affray.

J. T. James, for the defense, testified that he was in Perry's drug-store, adjoining Cropper's store, when he heard a fuss and went to the door. Deceased was sitting in his wagon, holding the lines; Bogan was on the east side of the wagon, with a chair drawn as if to strike. He was cursing the deceased, and called him a d—d liar. Deceased sat and took it a while, but all at once stood up in the wagon, pulled off his hat and coat, got out of the wagon and squared himself as if to fight. He said he

hated to whip a d—d stinking, beardless cuss like Bogan, and all at once struck Bogan on the left cheek, staggering him back, and then struck him again and knocked him down,— knocked him about ten feet. Bogan fell on his back, with his pistol drawn. The deceased took the pistol out of Bogan's hand, stepped back, and raised the pistol as if to strike, saying "G—d d—n you." He seemed to reconsider it, however, and lowered his hand a little. Just then the witness saw some one beyond with a pistol drawn, and, suspecting he might be in range, he left.

E. Shumaker, for the defense, testified that when he rode up the deceased and Bogan were quarreling, and he took the deceased by the arm and told him not to have any row. Bogan and the deceased were using pretty rough language, not precisely remembered by witness, but something was said between them about a "low-flung dog,— wouldn't fight." Deceased's wagon was twenty-five or thirty feet from Cropper's pavement, and Bogan was on the other side of it from witness. When the witness took hold of the deceased, Bogan was backing off from the wagon. The appellant was standing beyond and east of Bogan. Deceased said to witness, "turn me loose," got out of his wagon and knocked Bogan down, took Bogan's six-shooter and raised it up; and then the appellant ran up and with his six-shooter struck the deceased over the head. When the deceased struck Bogan, the latter was giving back. When the appellant ran up and struck the deceased, the latter had the six-shooter raised as if to strike, and was not entirely up from over Bogan, who was flat on his back. When the appellant struck the deceased his pistol went off. Appellant gave back, and the deceased followed him with his pistol in his hand, knocking with it or trying to shoot. Several shots were fired. Appellant backed eight or ten steps before the deceased was killed. The appellant is seventeen or

eighteen years of age; he and Bogan were friends, and the witness thought the appellant was going to marry Bogan's sister. On the cross-examination the witness stated that he was distantly related to the appellant.

Three other witnesses were examined by the defense, and their testimony in several material respects corroborated that already narrated on the same side.

In rebuttal two witnesses for the State testified that they examined the two pistols after the affray. Every barrel of the one used by the appellant had been discharged. Of the one taken from Bogan by the deceased only one barrel was empty, and there was no cartridge-hull in it, nor sign of fresh powder-burn; but on the contrary the empty barrel had dust in it.

The opinion discloses the matters of fact germane to the rulings on the questions of practice.

*Vardiman & Atkinson, G. P. Miller*, and *Eidson & Pierson*, for the appellant. The first point which we will discuss presents a jurisdictional question, and is raised by our supplemental assignment of errors, and is, the court erred in instructing the jury that this case was in the District Court of Coryell county on a change of venue from Hamilton county, when no transcript from Hamilton county had been filed in the District Court of Coryell county, and no evidence was offered showing or tending to show that the last named court had any jurisdiction of the case.

It is an elementary principle of criminal law that the venue must be proven. It is unnecessary to cite authority on this point. The reason why it is necessary, is to show that the trial court has jurisdiction of the case. It occurs to us that where the venue has been changed the statement of facts should show affirmatively that the court trying the case had jurisdiction. The District Court of Coryell county could not judicially take notice

of the records of the District Court of Hamilton county. Neither could the District Court of Coryell county judicially know the contents of a paper purporting to be a transcript from the District Court of Hamilton county, but never filed and never offered in evidence. Neither the pretended transcript from Hamilton county nor the indictment upon which appellant was tried were ever filed in the District Court of Coryell county, hence that court had no jurisdiction of the case. Code Crim. Proc. art. 56; Rules of Practice, 2 Texas Ct. App. 677–80; *Richarte* v. *State*, 5 Id. 359; *Thompson* v. *State*, 4 Id. 44; *Beardall* v. *State*, Id. 631; 1 Bishop C. P. 1355.

We now proceed to the discussion of the errors presented in our original assignment. The first of which is, the court erred in overruling defendant's plea in abatement, as shown by bill of exceptions. There are several grounds relied on in this plea, the most important of which are as follows:

1. The grand jury that found the bill of indictment was not a legal grand jury; they were selected for the April term, 1881, and not for the May term, 1881. (Code Crim. Proc. arts. 357, 359.) Even under the law in force at the time of their selection the next term of the court would not have been the April term, but the May term, and it would have come on the 2d day of May, 1881. (Gen'l Laws 16th Legislature, 14.) Hence the contingency provided for in art. 367, Code Crim. Proc., occurred, that is, there was a failure to select a grand jury as directed in that chapter of the Code of Criminal Procedure, in this, they were not selected for the next term of the court, which was the May term, 1881, but for the April term, 1881, when there was no term of the court, either according to the old or new law, and the court should have proceeded as directed in art. 367, Code Crim. Proc.

2. The clerk of the District Court of Hamilton county opened the envelope containing the list of said grand

jurors more than thirty days prior to the term of the court at which the indictment was found, it being the next term of the court. They were opened on the 2d day of April, 1881, and said next term of court began the 16th day of May, 1881. (C. C. P. art. 363.) In our view this article is mandatory; the language is, "within thirty days of the next term of the District Court, and *not before,* the clerk or one of his deputies shall open the envelope." And we are strengthened in this view by the requirements of art. 361, C. C. P., which provides that the clerk, before the list is delivered to him, and each of his deputies, shall make oath that he or they will not open the same before the time prescribed by law. And deputies subsequently appointed are required to take the same oath. (C. C. P. art. 362.) The envelope containing the list was opened forty-three days before the next term of the court, instead of thirty. And at the time the clerk opened it the law changing the time of holding the court had gone into effect. (Gen'l Laws 17th Leg. '78, '79.)

3. Said grand jury was not summoned by an officer authorized by law to summon them. T. C. Pierson, who summoned them, had been appointed in writing a deputy sheriff of Hamilton county, and had taken the oath of office, but the appointment and oath had never been recorded, as provided by law. Rev. Stats. art. 4520; *Alford* v. *State,* 8 Texas Ct. App. 545.

4. One of the grand jurors, Thomas Emmett, was a witness for the prosecution. His name was indorsed on the indictment as a witness for the State, and the statement of facts will show that he was the most material witness for the prosecution.

5. The defendant was not allowed the privilege of challenging the grand jury or any member of the same. (C. C. P. art. 377; *Reed* v. *State,* 1 Texas Ct. App. 1.) While none of these grounds are laid down in our Code of Criminal Procedure, as causes for challenges either to

the array or any member of the grand jury, still we think
they constitute violations of the defendant's rights, and
for which the courts should afford him some remedy.
(Bishop's Crim. Proc. 1st vol. 872.) And when the ob-
jection cannot be taken by challenge, the common method
is by plea in abatement. (Id. 885.) "And where the
court does not hold that a waiver has taken place, this
plea may show that the jury consisted of too many mem-
bers or too few, or that it was *otherwise incompetent.*
Even an irregularity in the summoning or impaneling of
the jury or selecting of the jurors may in those circum-
stances be taken advantage of in this way." Id. 884.
And we submit that no waiver took place in this case.
The defendant was arrested immediately after the act
was committed and placed in jail, and was confined
therein continuously from that time up to and during the
time when the grand jury was organized. He was a
mere youth, and was unable to secure counsel till after
the indictment was found, and did not know that the law
would require him to be brought into court at the organ-
ization of the grand jury upon his request. Suppose he
was brought before the magistrate and waived an exam-
ination, as the learned judge below suggests in expla-
nation to our bill of exceptions, that would not indicate
that he knew of his right to be present at the organiza-
tion of the grand jury on his request. It was only two
weeks from the time the act was committed till the next
term of the District Court, when the grand jury were
organized, and no doubt the magistrate or some one else
present told him that the grand jury would have to act
on the matter in any event, and since the time when they
would meet was so near it would be useless for him to go
into an examining trial. And the fact that the defend-
ant had numerous friends, among whom was the sheriff,
signified nothing unless they or some one of them knew
of this right of defendant and advised him of it. The

right of a defendant confined in jail to await the action of the grand jury to be present at the organization thereof upon his request is by no means generally known among the ordinary citizens; this right has only been accorded him by statute since the Revised Statutes went into effect.

The next assignment of error to which we will direct the attention of the court is, the court erred in its charge on express malice. That part of the charge of the court on express malice is erroneous, as follows: "The law, however, does not require that such design or intention should, when once formed, exist for any definite or prescribed period before it is put into execution, nor that it should exist prior to the occasion upon which the homicide is committed. If, in fact, it be deliberately formed in the mind of the slayer and be executed by him when his mind is sufficiently cool to consider of and comprehend the nature and consequences of the act about to be committed, express malice will exist, however short the space of time between the formation of the design and its actual execution in the commission of the homicide."

It is when the design to kill is formed that the mind should be sufficiently cool to consider of and comprehend the nature and consequences of the act. *Farrer* v. *State,* 42 Texas, 265. Another objectionable feature of this charge is, it gives too much prominence to the idea that, though the act was committed suddenly, still express malice could exist. It is calculated to impress on the minds of the jury that, in the opinion of the court, though the homicide was the result of a sudden quarrel, there was proof of express malice. *Johnson* v. *State,* 43 Texas, 612; *Stuckey* v. *State,* 7 Texas Ct. App. 174; *Renfro* v. *State,* 9 Id. 229; *Brown* v. *State,* 23 Texas, 201; *Ross* v. *State,* 29 Texas, 501. That part of the charge on express malice which instructs the jury that, "however sudden the killing may be," etc., is also objectionable because

tantamount to a charge on the weight of evidence. *John-son* v. *State*, 43 Texas, 412.

The court erred in charging the jury as follows, to wit: "But on the other hand if such external circumstances indicate that the intent to kill was conceived and executed in a transport of passion, or under the influence of sudden terror or excitement, when the mind was incapable of cool reflection, or that it was the offspring of a mind incapable from any cause of considering and weighing the consequences of the act about to be done, express malice cannot in law exist." We think the jury were led to believe by this instruction that they were authorized to find the defendant guilty of murder in the first degree, unless they believed from the evidence that the act was committed in a transport of passion, etc., thereby throwing upon the defendant the burden of disproving express malice, whereas the mere absence of proof of express malice reduces the homicide to murder in the second degree. If express malice is not proven, and no circumstances of justification, mitigation or excuse appear, it is murder in the second degree. *Harris* v. *State*, 8 Texas Ct. App. 90; *Summers* v. *State*, 5 Id. 359; *Farrer* v. *State*, 42 Texas, 265.

The 7th, 8th and 9th assigned errors relate also to subdivision 10 of the general charge. This instruction is the only one relating to murder in the first degree as applied to this case given to the jury, and is the charge upon which they found their verdict. The first sentence of said subdivision is as follows: "If the defendant is guilty of murder at all, the degree of his guilt will depend upon the state of his mind or the intent with which he committed the homicide." In this sentence the intent of the defendant is made equal in effect to the condition of his mind. Express malice is never presumed from the intent alone. *Farrer* v. *State*, 42 Texas, 265; *Primus* v. *State*, 2 Texas Ct. App. 369. Another objection to this charge

is, it virtually usurps the province of the jury by instructing them that defendant committed the homicide. *Walker* v. *State*, 42 Texas, 371; *Stuckey* v. *State*, 7 Texas Ct. App. 174. Again, nothing is said in said subdivision as to the intent with which Bogan sought or brought on the difficulty therein referred to. In order to have made defendant guilty of murder in the first degree it was necessary that Bogan should have sought and brought on said difficulty with express malice, and that defendant, *knowing such intent*, should have joined in and made himself a party thereto with the intention in his mind, deliberately formed, either to kill Smith or inflict on him some serious bodily injury which in its necessary or probable consequences might end in death, and if in the further progress of said difficulty, while his mind was in a condition to consider of and comprehend the nature and consequences of his acts, appellant shot and killed Smith, such killing would have been murder in the first degree. *Guffee* v. *State*, 8 Texas Ct. App. 187.

Appellant's knowledge of the origin and nature of the difficulty is not equivalent to his knowledge of the intent of Bogan. He may have seen the beginning of the difficulty, and heard or seen everything that occurred from that time to the end of the difficulty, and still not have known the intent of Bogan.

There was no evidence authorizing this charge. Appellant made no attempt to kill Smith until the latter turned on him with a pistol, and the fatal shot was not fired until deceased, who was a larger and more powerful man, had forced him to retreat thirty steps at the muzzle of a large pistol. To expect coolness and deliberation from a man under these circumstances is requiring too much of human nature. *Burnham* v. *State*, 43 Texas, 322; *Hamby* v. *State*, 36 Texas, 527; *Primus* v. *State*, 2 Texas Ct. App. 378; *Cox* v. *State*, 2 Texas Ct. App. 500.

The 10th assignment relates to the charge on murder in

the second degree, and here we submit that this portion of the charge does not properly distinguish between murder in the second degree and manslaughter. *Maria* v. *State*, 28 Texas, 698; *Lindsey* v. *State*, 36 Texas, 337. There was no evidence that defendant acted "under circumstances which are the ordinary symptoms of a wicked, depraved and malignant spirit, of a heart regardless of social duty and fatally bent on mischief," and this portion of the charge, having no application to the facts, should not have been submitted to the jury, as it could afford them no light and was calculated to mislead them. The court also instructed the jury that if appellant, "from whatever motive, engaged in and made himself a party to such difficulty," etc. This instruction authorized the jury to look for the motive of defendant outside of the evidence. The jury should also have been instructed that if Bogan and Smith became engaged in a personal combat, and if appellant seeing said difficulty conceived in his own mind the determination to kill Smith if the latter should make an assault on Bogan, and if in pursuance of said determination he engaged in said difficulty when said assault was made, and in said difficulty shot and killed Smith, then he would only be guilty of murder in the second degree. *Guffee* v. *State*, 8 Texas Ct. App. 187.

The 11th assigned error relates to the charge on manslaughter, and will be next considered. And here we find no definition or instruction as to what would constitute adequate cause as applied to the facts of this case. The jury were left to their own opinion without any guidance from the court as to what facts if proven would constitute adequate cause under the law. The court charged the jury that "if the facts set out in paragraph 16 were adequate cause to produce," etc. We think this was error because the jury, although they might believe those facts produced in the mind of defendant such sudden terror, anger, rage or resentment as to render his

mind incapable of cool reflection, still it was left to them
to determine whether or not these circumstances consti-
tuted adequate cause as contemplated by the statute.
The court should have charged the jury that an assault
and battery causing pain is an adequate cause. The
proof shows that deceased was a stouter man and struck
down Bogan. *Hill* v. *State*, 8 Texas Ct. App. 142; *Reed* v.
*State*, 9 Texas Ct. App. 316. The same rules which regu-
late the conduct of the person about to be injured in re-
pelling the aggression are applicable to the conduct of him
who interferes in behalf of such person. C. C. P. art. 72.
The court should have charged the jury that the striking
and knocking Bogan down (if the same was done) by
Smith if Bogan was a friend of defendant was suf-
ficient legal provocation to reduce the homicide from
murder to manslaughter, if in consequence thereof de-
fendant was in fact so enraged as to be incapable of cool
reflection, and while so enraged shot and killed Smith.
*Guffee* v. *State*, 8 Texas Ct. App. 203; *Maria* v. *State*, 28
Texas, 698; 1 Russell on C. 795–6; *McLaughlin* v. *State*, 10
Texas Ct. App. 340.

*H. Chilton*, Assistant Attorney General, for the State.
The first point raised in appellant's brief is not presented
so as to require revision. It is substantially a plea to the
jurisdiction of the District Court of Coryell county.
Such plea cannot be interposed for the first time in the
new tribunal. Art. 584, Code Crim. Proc.; *Krebs* v. *State*,
8 Texas Ct. App. 1. Where an indictment is preferred
in one county and defendant is tried in another county,
the record not showing a change of venue, the presump-
tion will be that there was a change of venue. *Doty* v.
*State*, 6 Blackf. (Ind.) 520. And it will be presumed
that the venue was rightly changed. *Hall* v. *Jackson*, 3
Texas, 308. The law does not require the transcript from
the one county to be filed in the other. Code Crim.

Proc. art. 585.   This is not like the charge of the court
(*Richarte* v. *State*, 5 Texas Ct. App. 359; *Thompson* v.
*State*, 4 Texas Ct. App. 44) which the statute, in terms,
requires to be filed.  Code Crim. Proc. art. 680.  This I think
is an ample answer to the present objection.   However,
if necessary, an answer yet more decisive will be found
in the fact that a complete record from Hamilton county
was filed June 21, 1881.   If the first transcript from
Hamilton county lacks verity (which I cannot admit),
the omission is fully cured by the subsequent certificate.
If the facts existed, at the proper time, it does not mat-
ter that the mere evidence of the facts was afterwards ·
produced.

The objections to the grand jury were both untimely
and untenable,— untimely, because by express statute a
challenge to the array, or to any particular grand juror,
must be made before the jury is impaneled, and in no ·
other way shall objections to the qualifications and
legality of the grand jury be heard.   Code Crim. Proc.
art. 377.   Not only does this article of the Code speak
explicitly on the subject, but the decisions are uniformly
to the same effect.   *Thompson* v. *State*, 2 Texas Ct. App.
550; *Cordova* v. *State*, 6 Texas Ct. App. 207.

If the objections had been duly presented, they would
have been ineffectual.   The law enumerates the grounds
of challenge to the array and to each juror, and declares
without qualification that challenges shall be made for
those causes only.   Code Crim. Proc. arts. 380, 381; *Green*
v. *State*, 1 Texas Ct. App. 82; *West* v. *State*, 6 Texas Ct.
App. 485.

The term of the court for which the grand jury was
selected was deferred or changed by legislative enactment,
and the defendant could with more plausibility have
made complaint if the judge had failed to recognize the
juries selected at the last term of the court theretofore.
The regulation concerning the opening of the list is

purely a direction, although a right is thereby conferred which cannot be disregarded with impunity. In this case the action of the clerk is so clearly and reasonably accounted for that it is deemed unnecessary to discuss the point further. The acts or authority of an officer are not subject to be attacked as was attempted in this case. The validity of a criminal trial cannot be undermined or delayed by such collateral inquiries. It is enough that Pierson was an officer *de facto*. A bill of indictment cannot be retroactively destroyed by reason of the summoning of one of the grand jurors as a witness for the State.

The charge of the court, taken as a whole, and in fact viewing its several parts abstractly, is a lucid, thorough and temperate statement of the law applicable to every phase of the case. Concerning the last part of the 5th subdivision of the charge, it is enough to say that the word "deliberately" is used before the word "formed." If it was, therefore, necessary to specify that the mind must be cool and sedate when the intent was formed, this sufficiently does so. But this objection is bad in substance.

Concerning the point adverted to from time to time in the brief, that the court assumes that defendant committed the homicide, no more need be said than that this was not a controverted question in the case. The witnesses on both sides show that defendant committed the homicide, and no defense based on a contrary supposition was attempted.

WINKLER, J. The appellant was indicted by the grand jury of Hamilton county, charged with the murder of F. A. Smith, alleged to have been committed in Hamilton county, Texas, on May 2, 1881. The case was not tried in Hamilton, but was transferred by change of venue to the county of Coryell, where a trial was had on June 11,

1881, which resulted in a verdict of guilty of murder in the first degree and the assessment of the death penalty. Judgment being rendered in accordance with the verdict of the jury, and a motion for a new trial having been overruled, this appeal is prosecuted. Some of the main features of the transactions relating to the killing of the deceased and the indictment and trial of this appellant may be briefly stated as follows: On the day of the homicide the appellant Kemp and one Bogan were in the town of Hamilton. During the day the homicide was committed a quarrel ensued between Bogan and the deceased, leading on to a personal rencounter between them. Whilst these two, Bogan and the deceased Smith, were engaged and fighting together, the appellant Kemp interfered on the side of Bogan. The attention of Smith was drawn from Bogan to Kemp, and the contest then became one between Kemp, the appellant, and Smith, which continued between them until Smith fell from a pistol shot fired by the appellant Kemp.

The circumstances of this case in many of its controlling features bear such analogy to the cases of *Guffee* v. *State*, 8 Texas Ct. App. 187, and *Foster* v. *State*, Id. 248, that the rules of law enunciated in those cases will apply in the main to the one now under consideration; so that, in so far as the law of this case has been settled in the cases referred to, we will content ourselves with the rules there laid down rather than enter upon an extended examination of authorities upon which the rules deduced appear to rest. We are not inclined to the opinion now that further investigation would result in any material change, for the reason that those cases when before this court were decided after very careful consideration of the best accessible authorities on the questions involved and from which our conclusions emanated.

In the present case, however, there was a matter preliminary to the trial and prior to the change of venue

which will have our first attention. The defendant pleaded in abatement of the indictment presented against him. In the plea the defendant avers that he was confined in jail at the time the grand jury which presented the indictment against him was organized and impaneled, that he was a minor without means to employ counsel and had to depend upon friends for the means of employing counsel, and in fact had no counsel to represent him until after the indictment had been found and returned into court; that he did not know nor was he informed of the time when the grand jury would be organized, or that he even had the right to challenge the array or any individual member of the grand jury; that the persons composing the grand jury were not selected by the jury commissioners for the term of the court at which they found the indictment; that the list was not certified by the jury commissioners as required by law; that the envelope which contained the list was not properly indorsed; that the clerk had opened the envelope more than thirty days prior to the time of the meeting of the court, *i. e.,* that it was opened April 2, 1881, and the court did not meet until May 15, 1881; that the grand jury was summoned by a person unauthorized by law; and that one member of the grand jury was one of the principal State's witnesses in the prosecution against him. The court below overruled the plea and the defendant excepted.

Aside from the statement appended by the presiding judge to the bill of exceptions to his ruling on the plea, which appears to explain in a very satisfactory manner the objection to the grand jury, the opening of the envelope, and the official capacity of the officer who summoned the grand jury, and the like, we are of opinion the correctness of the rulings of the judge on the plea must be determined and stand or fall by a proper interpretation and application of several articles of our Code of Procedure as we find them to be since the last revis-

ion, and which were in force at the time of the trial on the plea in question. By article 376 it is provided that when twelve qualified jurors are found to be present the court shall proceed to impanel them as a grand jury, unless a challenge is made, which may be to the array or to any particular individual presented to serve as a grand juror. The next succeeding article directs the time and manner of making a challenge, and succeeding articles prescribe causes of challenge to the array or to an individual grand juror.

In order that we may be fully understood we quote the language of the several articles. "Art. 377. Any person, before the grand jury has been impaneled, may challenge the array of jurors or any person presented as a grand juror, and in no other way shall objections to the qualifications and legality of the grand jury be heard. Any person confined in the jail of the county shall, upon his request, be brought into court to make such challenge. Art. 378. By the array of grand jurors is meant the whole body of persons summoned to serve as such, before they have been impaneled. Art. 379. A grand juror is said to be impaneled after his qualifications have been tried and he has been sworn. By the word 'panel' is meant the whole body of grand jurors. Art. 380. A challenge to the array shall be in writing, and for these causes only: 1. That the persons summoned as grand jurors are not in fact the persons selected by the jury commissioners. 2. In case of grand jurors summoned by order of the court, that the officer who summoned them has acted corruptly in summoning any one or more of them. Art. 381. A challenge to a particular grand juror may be made orally, and for the following causes only: 1. That he is not a qualified grand juror. 2. That he is the prosecutor upon an accusation against the person making the challenge. 3. That he is related by consanguinity or affinity to some person who has been held

to bail, or who is in confinement upon a criminal accusation." It will be noticed that the language of these articles differs from corresponding articles of the Code as in force prior to the revision, and it seems that article 401 of the old Code (Pasc. Dig. art. 2868) has been entirely omitted from the revision, and is no longer in force. We are of opinion, however, that the substance of the omitted article is virtually embraced in the enlarged provisions we have quoted, as will be apparent by comparing the articles now in force with the corresponding articles of the former Code.

It will be seen from the articles quoted that there are but two causes of challenge to the array, and, agreeably to article 380, these are the only challenges to the array the law permits. Also, with reference to a particular juror, there are enumerated and specifically named three causes of challenge, to the exclusion of every other, by article 381.

This is not all. The causes of challenge are not only enumerated, and declared to be the only challenges the law permits either to the array or to an individual grand juror, but the time at which these challenges must be made is limited to a particular stage of the proceedings. They must be made before the grand jury has been impaneled; and not only so, but the law further declares that in the way here pointed out and *in no other way shall objections to the qualifications and legality of a grand jury be heard.*

Hence our conclusions are that the qualifications as well as the legality of a grand jury cannot be questioned after the grand jury shall have been impaneled; that, if there be any cause of challenge, such cause must be made available in the manner pointed out in the appropriate article, and before the grand jury is impaneled, but not after. The right of a prisoner confined in the jail of the county to make such challenge is limited to the time before the grand jury shall have been sworn. But further,

a person so confined is entitled to be brought into court whilst the grand jury is being impaneled only *upon his request* of that privilege. If he does not make such request at the proper time, he is not permitted to complain afterwards. This is, we are of opinion, the proper interpretation and application of the several articles of the Code. It is too late to make any objection to the qualifications of a grand jury, or to the legality of a grand jury, after it has been impaneled and sworn.

There are other provisions of the Code of Procedure at present in force which it would be well to consider in connection with the general subject we have been discussing. "Art. 522. On the part of the defendant, the following are the only pleadings: 1. The motion to set aside the indictment or information. 2. A special plea setting forth one or more facts as cause why the defendant ought not to be tried upon the indictment or information presented against him. 3. An exception to the indictment or information for some matter of form or substance. 4. A plea of not guilty. 5. A plea of guilty. It will be seen that the causes which may be assigned in a motion to set aside an indictment or information, as provided for in clause 1 of article 522, are limited and restricted to the two grounds mentioned in article 523. The special pleas mentioned in clause 2 of article 522 are limited to the two mentioned in article 525; which are, 1, former conviction, and 2, former acquittal. The exception to an indictment or information must be for some matter of form or substance. The exceptions to the *substance* of an indictment or information are limited to the causes set forth in article 528, and exceptions to the *form* of an indictment or information are in like manner limited to causes enumerated in article 529. The other two pleas mentioned in the fourth and fifth clauses of article 522 are also defined and the pleading and practice described in other articles of the Code.

By a careful comparison of the defendant's plea in

abatement it will be found that, as we have seen, those portions of the plea which call in question the organization or legality of the grand jury could only have been reached in the manner prescribed by the Code, and before the grand jury had been impaneled and sworn. Upon a further comparison of the plea with the articles of the Code as to what a defendant may plead, and the manner in which these several pleas have been circumscribed, it is apparent that the defendant by his plea did not bring himself within any provision of the Code which he could invoke for his protection. We therefore conclude that the court below did not err in overruling the plea in abatement.

It may be, however, that as a matter of practice it would not be amiss for the district judge, when about to organize a grand jury for any term of court, and when it can be done with safety, to have the prisoners confined in jail brought into court that they may have an opportunity to challenge the whole or any portion of the grand jurors before they are impaneled and sworn, and this for what seems to us still to be reasonable, as indicated in *Reed* v. *State*, 1 Texas Ct. App. 1; not as a matter of right, unless requested at the proper time, but as a matter of expediency, and an additional safeguard against an improper indictment.

There is another matter presented in the record and discussed in argument by the appellant's counsel which should not be overlooked. The judge in his prefatory remarks to the jury in effect told the jury that the case was on trial in Coryell county by change of venue from Hamilton county, and proceeded to charge the law of the case. It is not attempted to be shown that this was not the fact. The record discloses no statement as to any controversy over the regularity of the change of venue; but, even if it had been contested, for aught that appears from the record here, the action of the court was not

only warranted but was eminently proper, and was fully warranted by art. 576, Code Crim. Proc. The controversy seems to have arisen from the fact that the transcript and papers from the court in Hamilton county had not been in fact filed in the District Court of Coryell county. This was at most but a mere irregularity, and could have been corrected at any time by direction of the court. Besides, we find in the record a motion made by the defendant's counsel which commences with the language: "And now comes the defendant in this cause by attorneys and shows to the court that the transcript filed in this court of the proceedings had in this cause in the District Court of Hamilton county is incomplete in this, that the proceedings had in this cause on the 25th day of May, A. D. 1881, in the District Court of Hamilton county is not included in said transcript; Wherefore," etc. The motion was very properly refused, agreeably to the statement of the judge appended to the bill of exceptions taken to his ruling. We are of opinion the record shows that the venue was properly changed from Hamilton to Coryell, and that the motion to amend the record, under the circumstances detailed by the judge, was properly refused, in that it deprived the defendant of no legal right that we can perceive. The preliminary remark of the judge was at most a harmless one, and did not form any part of the charge proper by which the case was to be determined.

To return to a consideration of the question involved in the main case as presented by the record. The circumstances under which the homicide took place, as detailed by the witness, invoked at the hands of the court clear and explicit instructions as to murder of the first and second degrees, or manslaughter, and on homicide in self-defense, as well as suitable instructions on the subject of the right of the defendant to intercede in behalf of his friend, and explaining the circumstances

under which he might intercede and the extent to which the law permitted him to go in order to protect his friend as well as the consequences resulting to the defendant in case he carried his interposition to an extent not warranted by law.    These are the main points arising upon the testimony and to which it became the duty of the judge to instruct the jury in his charge.

It is not shown by the evidence, except from circumstances, whether the defendant engaged with Bogan in the rencounter against the deceased, having a common intent to take the life of the deceased or to do him such bodily injury as might result in the death of the deceased. This was a pertinent and material inquiry to be submitted to the jury by the charge, the jury being left free to determine the question as the proof warranted.    Another important inquiry was as to the condition of Bogan and the deceased at the very point of time at which it is shown by the testimony the defendant interfered, in order to determine whether the law permitted the interference of the defendant at that precise time, and to what extent the law authorized such interference on the part of the defendant.    Another important inquiry is as to the result of a killing by the defendant after his interference on behalf of his friend.    To our mind it appears with a considerable degree of clearness, from the statement of facts, that the defendant and Bogan were intimate friends at the time of the homicide; that they were together on that day in the town of Hamilton, where the homicide took place; that Bogan was under the influence of intoxicating liquor at the time he first met with the deceased; that the defendant was sober, so far as the testimony discloses, during the entire day.    There is evidence tending to show that, prior to the time Bogan and the deceased engaged in the rencounter, the defendant endeavored to induce Bogan to go with the defendant home.    The evidence tends to show that at the time of the rencounter both the defend-

ant and Bogan were strangers to Smith, the deceased. When Bogan and the deceased commenced their quarrel, the deceased was in his wagon; that during an angry altercation which ensued between Bogan and the deceased the latter got out of his wagon on to the ground. A wordy altercation and mutual banterings to fight ensued, during which Bogan attempted to draw a pistol. The deceased told him if he did draw his pistol that he, the deceased, would knock him down. Bogan did draw, and the deceased did knock him down. Agreeably to the testimony, the defendant, who had been standing near, interfered, rushed up with his pistol in hand and seized the deceased by the shoulder with his left hand, and with his right hand struck the defendant a lick over the head with his pistol, the lick glancing to the deceased's shoulder. Just about this time the defendant rose and, with Bogan's pistol in his hand, turned upon the defendant, who commenced backing, and the deceased following him up with the pistol in his hand, the defendant keeping his pistol between himself and the deceased and endeavoring to fire upon the deceased, and the deceased with the pistol he had knocking at the pistol arm and hand of the defendant. Whilst thus retreating and advancing, some shots were fired by the defendant, a portion being what the witnesses call squibs, neither of which took effect until, while the parties were in this situation, the defendant fired the fatal shot and the deceased fell and died in a few moments. The testimony impresses us with the belief that Smith, the deceased, was a stout, athletic man and not afraid of a difficulty, but that he was unarmed until he procured Bogan's pistol, and that he did not intend or attempt to take the life of either Bogan or the defendant.

The charge of the court was very full and elaborate, and applies to every feature of the case as presented by the evidence. But, if there is any evidence at all of a

knowledge of the defendant as to the motives which actuated Bogan in bringing on a difficulty with the deceased, such evidence was very meager indeed, and from the meagerness of the testimony as to whether there was any cooling time allowed the defendant under the circumstances by which he was surrounded, or whether he had time to form that sedate and deliberate mind necessary to constitute murder in the first degree, we are led to scan the charge minutely in order to determine whether in the charge (prepared during what must have been an exciting trial) there was embodied some clause which was calculated to mislead the jury. In taking up and reading the charge of the court, paragraph by paragraph, and considering each one separately in the light afforded by the appellant's brief, we are driven to the conclusion that the greatest objection to which any paragraph may be subjected does not amount to more than a harmless criticism upon the verbiage employed, and does not involve any erroneous statement of the principles of law in the particular instance complained of, or of which the defendant can reasonably complain; and, taking each paragraph separately or the whole charge collectively, we regard it as a full and complete elucidation of the law arising upon every deduction arising upon the evidence. The charge is not likely to mislead a sensible jury after a careful reading in its entirety. A discussion *seriatim* of the several objections urged in the brief and oral argument of the defendant's counsel would result in an unnecessary and unprofitable consumption of time. That portion of the charge on the subject of killing in defense of self or another is, in our opinion, exceptionally fair to the defendant. The line which separates the two degrees of murder was clearly defined, and in fact the general principles and definitions, and their application to the facts in the case, are alike free from objection, so far as we have been able to perceive. The charge also embraced

the presumption of innocence and the reasonable doubt as to murder in the first degree, and between the two degrees of murder as well as between murder in the second degree and manslaughter, and as to whether the defendant was guilty of any offense whatever. Besides this there was a single charge asked by the defendant, which was given by the judge without modification or qualification, so far as the record discloses.

Yet, aside from all this, we are constrained to say that the evidence as to express malice is not sufficient to support a verdict of murder in the first degree. It is not sufficient as to the intent which actuated the mind of Bogan when he entered into the controversy with the deceased, nor to establish the fact that the defendant knew the intent with which Bogan entered into the rencounter. It is uncertain on the subject of the intent with which the defendant entered into the difficulty between Bogan and the deceased, and as to whether the defendant had cooling time from the time he entered into the difficulty until the homicide was consummated. The testimony on these vital points in the case is too meager to support a conviction of murder in the first degree with the death penalty.

We are of opinion the court below erred in overruling the motion for a new trial upon the evidence; and for this error the judgment will be reversed and the case remanded.

*Reversed and remanded.*